1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF RHODE ISLAND

3

4
     * * * * * * * * * * * * * * *    C.R. NO. 19-112-JJM
5                                *
     UNITED STATES OF AMERICA     *
6                                *
         VS.                      *    SEPTEMBER 10, 2021
7                                *    10:00 A.M.
     RONALD W. ZENGA             *
8                                *
     * * * * * * * * * * * * * * *    PROVIDENCE, RI
9

10          BEFORE THE HONORABLE JOHN J. McCONNELL, JR.,

11                      DISTRICT JUDGE

12
                     (Sentencing Hearing)
13

14   APPEARANCES:

15   FOR THE GOVERNMENT:   JOHN P. McADAMS, AUSA
                          U.S. Attorney's Office
16                         50 Kennedy Plaza
                          Providence, RI  02903
17
     FOR THE DEFENDANT:    JOHN E. MacDONALD, ESQ.
18                         Law Office of John E. MacDonald
                          One Turks Head Place Suite 1440
19                         Providence, RI  02903

20                         JOHN L. CALCAGNI, III
                          Law Office of John L. Calcagni, III
21                         72 Clifford Street, Suite 300
                          Providence, RI  02903
22
     Court Reporter:       Karen M. Wischnowsky, RPR-RMR-CRR
23                         One Exchange Terrace
                          Providence, RI  02903
24

25

1    10 SEPTEMBER 2021 -- 10:00 A.M.

2         THE COURT:  Good morning, everyone.  We're here

3    this morning for a sentencing in the case of the United

4    States versus Ronald W. Zenga, Criminal Action 19-112.

5         Would counsel identify themselves for the

6    record, please.

7         MR. McADAMS:  Good morning, your Honor.  John

8    McAdams on behalf of the United States.

9         THE COURT:  Good morning, Mr. McAdams.

10        MR. CALCAGNI:  Good morning, your Honor.  John

11   Calcagni on behalf of Mr. Zenga.

12        THE COURT:  Good morning, Mr. Calcagni.

13        MR. MacDONALD:  Good morning, your Honor.  John

14   MacDonald on behalf of Ronald Zenga.

15        THE COURT:  Good morning, Mr. MacDonald.

16        Good morning, Mr. Zenga.

17        THE DEFENDANT:  Good morning, your Honor.

18        THE COURT:  Mr. Zenga, the Probation Department

19   issued a presentence report in your case.  Did you

20   receive a copy of that?

21        THE DEFENDANT:  Yes, your Honor, I did.

22        THE COURT:  Okay.  And did you have a chance to

23   review that with your attorneys?

24        THE DEFENDANT:  Yes, your Honor.

25        THE COURT:  And did they answer all -- folks,

1  why don't we sit down.  I should say the protocols that

2  we follow, the COVID protocols we follow, is that

3  everyone in the courtroom has been vaccinated.

4  Everyone in the courtroom that's going to speak has

5  been tested.  They've all turned out negative, so

6  you're allowed to remove your mask when you speak if

7  you'd like.

8         If you want to keep your mask on, you're also

9  welcome to do that.  It's totally up to you.  We have

10  assured ourselves we're following proper public health

11  protocols.

12        It's very difficult to hear in here.  So when

13  you do speak, it might be really helpful if you took

14  your mask off, if that's possible.  Please speak right

15  into the microphones; and counsel, too, when you get up

16  at the stand, that would be helpful, as well as the

17  fact that -- so that there's public access to this, the

18  proceeding is being Zoomed, despite the fact that we're

19  in person for it, for the purposes of assuring

20  transparency and public access.  And I think that's all

21  the protocols.

22        So let me just repeat again, Mr. Zenga, you have

23  received a copy of the presentence report?

24        THE DEFENDANT:  Yes, your Honor.

25        THE COURT:  And you've reviewed that with your

1    lawyers?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  And they've answered all of your

4    questions?

5              THE DEFENDANT:  That's correct.  Yes, they have.

6              THE COURT:  Okay.  How we're going to proceed,

7    first we're going to begin with the calculation of the

8    guideline range.  I'll see if there's any objection to

9    the guideline range.  There haven't been any filed, but

10   we'll see if anyone has any objection to that or the

11   presentence report.

12             And then Mr. McAdams will present the

13   Government's position, and then will the -- during your

14   presentation, Mr. McAdams, do you intend to read the

15   statements from the victim and the victim's mother?

16             MR. McADAMS:  Yes, your Honor.  I intend to do

17   that at the beginning of my presentation, your Honor.

18             THE COURT:  Okay.  And then one of your lawyers,

19   Mr. Zenga, will be able to present on your behalf.

20   Then you'll be allowed to speak to the Court if you

21   want to or not, it will be totally up to you whether

22   you do or not, and then I'll get on with the business

23   of the sentence.  Okay?

24             THE DEFENDANT:  Yes, your Honor.  Thank you.

25             THE COURT:  So the guidelines are calculated as

1  follows.  So the various counts have been grouped as

2  follows:  Count I, which is the enticement or coercion

3  of a minor to engage in illicit sexual activity, the

4  base offense level for that offense is 28.

5        There's two points added because the Defendant

6  is the parent of the minor victim.  There are two

7  points added because the Defendant otherwise used undue

8  influence over a minor to engage in prohibited sexual

9  conduct.

10       There are two points added because a computer or

11 other interactive computer service was used to entice

12 or encourage, solicit or offer.  There are two points

13 added because the offense involved the commission of a

14 sex act.

15       There are eight points added because the offense

16 involved a minor who had not attained the age of 12 for

17 an adjusted offense level of 44.

18       Counts VI, VII and VIII, which are the

19 distribution and receipt and possession of child

20 pornography, first let me inform everyone paragraph 42

21 contains an error in one spot.

22       The base offense level for those offenses is

23 actually 22.  It says so in the paragraph; but when it

24 carried out, it didn't carry through.  So the base

25 offense level is a 22 for those three counts.

1          You can see that the paragraph says that section

2     provides a base offense level of 22, but there was a

3     typographical error.  It doesn't affect any of the

4     numbers, but I want to make sure that's correct.

5          There's two points added because the material

6     involved here, the pornography, involved a prepubescent

7     minor.  There are seven points added because the

8     offense involved the distribution to a minor that was

9     intended to persuade, induce, entice, coerce or

10    facilitate the travel of the minor to engage in

11    prohibited sexual conduct.

12         There's five points added because there was a

13    pattern of activity involving the sexual abuse or

14    exploitation of a minor.

15         There are two points added because the offense

16    involved the use of a computer.  There are four points

17    added because there were at least 300 images but fewer

18    than 600 images, and specifically here there were 355

19    images found, plus seven videos.  So four points are

20    added for an adjusted offense level of 42.

21         When you follow the guideline calculation

22    combined adjusted offense levels, we use the higher

23    number of 44.

24         There are Chapter 4 enhancements here involved

25    because the Defendant engaged in a pattern of activity

1    involving prohibited sexual conduct taking the offense

2    level up to 49.

3         There's a two-point reduction for acceptance of

4    responsibility.  And, Mr. McAdams, does the Government

5    wish to make a motion on the third point?

6         MR. McADAMS:  Yes, your Honor.

7         THE COURT:  That will be granted.  So the

8    calculation then takes that down to a 46; but the

9    sentencing guidelines cap the offense level at 43.  So

10   the guidelines, therefore, call for this offense level

11   to be 43.

12        Mr. Zenga has no criminal history; therefore, he

13   has zero points.  So a total offense level of 43, a

14   criminal history category life (sic), comes with a

15   recommended period of incarceration of life.

16        Mr. McAdams, any objection to the PSR or the

17   calculation of the guidelines?

18        MR. McADAMS:  No, your Honor.  Thank you.

19        THE COURT:  Mr. Calcagni?

20        MR. CALCAGNI:  No, your Honor.  Thank you.

21        THE COURT:  Great.  Thanks.  I'll call

22   Mr. McAdams to come up now; but while he's coming up,

23   let me also say that I received a memo from the

24   Government, a sentencing memo.  I received a sentencing

25   memo from the Defendant; and in addition to that, there

1    were a number of letters of support.

2         There was a report of a psychological and sexual

3    evaluation by Dr. Keating or Mr. Keating or either way.

4    Let's see.  I think it's Mr. Keating.  And I received

5    information from Wyatt concerning Mr. Zenga's conduct

6    while incarcerated pretrial.  I think I've got that all

7    right.

8         So, Mr. McAdams.

9         MR. McADAMS:  Thank you, your Honor.  Your

10   Honor, as I know you are aware, the minor victim is

11   observing these proceedings through the Zoom

12   technology; and she wanted me to confirm that you are

13   able to see her as I read her statement to you, and I'm

14   hoping that you can do that technologically.

15        THE COURT:  I cannot see her.  There's a name

16   that pops up on my screen.

17        THE CLERK:  She has to turn her camera on.

18        MR. McADAMS:  If it's okay, I'm just going to

19   text our victim witness advocate who is with her.

20        THE COURT:  She maybe is watching and can hear

21   us that she needs to turn her video on.

22        MR. McADAMS:  I will tell her that.  Bear with

23   me, please.  Thank you.

24        THE COURT:  I can now see the U.S. Attorney's

25   Office.

1      MR. McADAMS:  Okay.  Thanks.  They're probably

2   just getting in position to be in front of the camera,

3   your Honor.

4      THE COURT:  The camera is now on.  Go ahead,

5   Mr. McAdams.

6      MR. McADAMS:  Thank you, your Honor.  So as I

7   indicated a moment ago, before I make my argument on

8   behalf of the Government, I'd like to read into the

9   record the victim impact statements that were

10   submitted.

11      Your Honor, there were -- as you know, this

12   sentencing's been delayed a few times.  And so

13   initially the minor victim and her mother submitted

14   victim impact statements back in January of this year,

15   which were included in the PSR.

16      The first statement submitted by the victim's

17   mother is quite lengthy, and she and I discussed it,

18   and she asked me not to read it today but just to

19   confirm that your Honor had an opportunity to read that

20   letter.  So I'm not going to read that one.

21      THE COURT:  I received it.  I think it was an

22   eight- or ten-page letter from the young woman, I hate

23   to keep calling her the victim, the young woman's mom,

24   and I have read that.

25      I've read everything, including the -- I

1   received a typed copy of what you're going to read.

2   I've read that as well.

3          MR. McADAMS:  Okay.  Thank you, your Honor.  And

4   then just a few days ago there were two new

5   supplemental statements that were submitted which we

6   provided to the probation office and defense.

7          I understand that probation may not have

8   forwarded that to chambers yet.  I will read those as

9   well.  They're not as long.

10          So just in terms of order, first I'm going to

11   read the statement from the mom.  (Reading) Your Honor,

12   thank you for allowing our words to be heard.  I stand

13   with my daughter in solidarity; and even though I am

14   here in person, I refuse to offer the Defendant any

15   satisfaction in hearing our voices or seeing our faces

16   and have asked Mr. McAdams to read my statement for

17   today's proceedings.

18          In my 20-plus years, I have never known the

19   Defendant to learn from his mistakes, at least not in a

20   way that would lead anyone to believe that he felt

21   remorse or had any understanding and accountability for

22   his actions.

23          Instead, I have witnessed and experienced the

24   Defendant learn how to avoid being caught, making the

25   same choices and mistakes again in the future.  He

1  would adjust and tweak his behavior and actions to hide

2  any previously held telltale signs.

3       Also in my 20-plus years, I have never known the

4  Defendant to keep faith under any religious creed,

5  philosophy or idea.  In fact, for many years the

6  Defendant had put me down and claimed I was, quote,

7  unquote, "stupid" for my own personal Christian

8  beliefs.

9       Additionally, the Defendant in no uncertain

10 terms has very clearly and proudly proclaimed to be an

11 atheist and extremely angry with organized religion or

12 any structure that believed to be -- that believed in a

13 higher being or energy other than himself.

14      A dear friend recently shared with me a letter

15 sent on the Defendant's behalf requesting letters of

16 reference for him in this sentencing.  Imagine my shock

17 and surprise to find references of God and blessings in

18 the Defendant's words asking for sympathy and support.

19      I remember very clearly having conversations

20 with him stating the very irony of convicts

21 conveniently finding religion once they have been

22 caught, and now the tables have been turned and we see

23 a man using whatever tactics necessary to paint a very

24 false picture of who he really is.

25      Rest assured, the pure, unadulterated

1  manipulation is nothing short of the Keith Ranieres of

2  NXIVM or the Jeffrey Epsteins of the world.

3      While I have truly seen people change and grow

4  from their mistakes, I believe without a doubt the

5  Defendant is not one of those people, not because I

6  find it convenient for this narrative, but due simply

7  to his course of action during the entire legal process

8  of the divorce between us and how he chose to navigate

9  through this case as well.

10     Instead of immediately admitting to his guilt,

11  something he did at the time of his arrest to

12  investigators, he chose to maintain some fake notion of

13  innocence.

14     Your Honor, the crimes he committed involved the

15  Defendant's own child.  He slapped her in the face at

16  every turn, dragging this process out in both Family

17  Court and yours here today, and sadly I never expected

18  him to cooperate in any way true to his form; and for

19  the last three years, he has lived up to that

20  expectation.

21     Your Honor, my daughter and I have nothing less

22  than a lifetime of pain and trauma that will follow us

23  throughout our days.  I ask you for relief and to

24  sentence the Defendant to no less than life in prison.

25  Please allow us the chance to heal without ever having

1    to look over our shoulder again.  Thank you.

2         Your Honor, now I'll read the initial statement

3    that was submitted by the primary victim.  I also don't

4    like using that word; but I don't have a better word,

5    so I'm going to use it.

6         THE COURT:  Understood.

7         MR. McADAMS:  Thank you.  It's dated January

8    13th of 2021.  (Reading) Your Honor, given the events

9    of the last two years, it has come to my attention that

10   not everything is clearly seen in this case as I had

11   once thought.

12        I did not and do not feel the need to say

13   anything for this man who has wronged me constantly for

14   10 years of my life and has the audacity to call

15   himself my father, nor does he deserve to hear it.

16        However, one thing that is clear in this case is

17   the things left over that still affect me at this time

18   two years later.

19        Lack of emotional development.  Children usually

20   grow up learning of their emotions and how to handle

21   them.  Unintentionally, from a young age, I had stopped

22   letting myself feel those emotions and shut them down.

23   Now as a 15-year-old, I have to figure out how to deal

24   with these emotions in a way other than avoidance and

25   self-harm as well as learn how to let myself feel them

1    again.

2         Hypervigilant.  I am now constantly hyperaware

3    of everything around me.  Needless to say, it keeps me

4    constantly on my toes, never able to relax, even if I'm

5    alone in my room which is meant to be a safe place.

6    This also makes going into a social setting or public

7    space very difficult, leading me not getting out of the

8    house very much or even isolating in my home -- in my

9    own home.

10        Trust issues.  I suppose this one was a given,

11   but it still needs to be said.  My trust issues stop me

12   from letting myself get attached to people and even

13   pull away from ones that I've known for years without

14   explanation once again leading to self-isolation.

15        Memory gaps.  The abuse I have suffered lasted

16   10 of my 15, so far, years of my life.  For anyone any

17   age, that is a decade worth of pain.  So much of that

18   time has been pushed away to the back of my mind where

19   I can no longer reach, also leaving me unable to

20   distinguish between good and bad memories and if the

21   good memories were real or just my imagination.

22        Disassociation.  My inability to focus hinders

23   me on a daily basis.  At the moment I am a student in

24   high school with extracurricular activities.  It also

25   interferes with my social life because I am constantly

spacing out for what seems like no reason.  It's truly
frustrating and inconvenient, to say the least.

Self-isolation.  As I have stated multiple
times, I also have a problem with self-isolation.  This
is one of the biggest problems I am facing because of
all this case has done to me.  The isolation I put
myself through has given me anxiety in social settings
as well as the inability to handle confrontation of any
kind.

The worst part is that I don't know how to stop.
I know there are many people around me who care and
want to help, but I do not allow myself to be helped by
them and prefer to be alone.

On the contrary, if I'm alone for too long, all
I want is to cling to someone.  The back and forth is
emotionally painful, and trying to convince myself that
everything is okay does not ease that pain.  I suppose
that's a good thing seeing as though accepting it is
the first step to healing, even though I have so far
refused to take that step.

Poor boundaries.  This is directly from what I
have experienced.  I was never taught that it was okay
to say no.  I still have serious trouble saying no, no
matter the person.  I also apologize too often and for
things that I have nothing to do with me in the least.

1        It feels like anything that inconveniences other

2    people I care about must somehow be my fault.  I'm so

3    used to feeling like I am meant to be used and whenever

4    I'm not serving my purpose, I'm just a burden.  So I

5    let people violate my boundaries, boundaries which at

6    this point I do not set to begin with, believing that

7    it's because they won't be around long enough to do

8    real damage.  In reality, it is because I haven't given

9    them any helpful information on these subjects.

10        Physical responses.  I have developed a strange

11   physical reaction that is very similar to Tourette's

12   Syndrome, body movements that I cannot control when I

13   am uncomfortable, triggered or even a little too hot or

14   cold.

15        This was caused by the amount of shaking my body

16   went through when the Defendant was initially arrested.

17   These tics range from quick body movements when it is a

18   small inconvenience, example, being cold, to being

19   longer body movements and verbal when things are very

20   bad, example, not fully recovering from a breakdown.

21        I also have problems with strong and frequent

22   heart palpitations as a result of anxiety attacks.  I

23   have had to wake up my mom in the middle of the night

24   many times from these experiences.

25        Your Honor, I'm going to read the most recent

1  statement that was written a few days ago.  (Reading)

2  Your Honor, over the last three years now, I have

3  learned many things.  I have learned that some things

4  that are so easy for most people are much more

5  difficult for me now.

6       On one hand, I have learned that emotions are

7  something we are not born with but are taught.  The

8  most painful part of trauma is realizing that someone

9  has wronged you, and I have learned that I spent

10  literally half my life in the dark; but on the other, I

11  have learned that love is possible after loss.  I've

12  learned who will stand with me and who I will stand

13  against.

14       When I was little, I tended to stay quiet.  Out

15  of panic, I could just never find the words.  Later I

16  just refused to find them.  But today, your Honor, I am

17  choosing to find and use those words.

18       I have chosen not to speak today as to not grant

19  the satisfaction to those who have wronged me.  I hope

20  you can understand.  The Defendant does not deserve to

21  know anything more than he remembers.  He does not

22  deserve to know how I have grown.  If I'm lucky, maybe

23  he'll forget I even exist.  Unfortunately, I know that

24  may never be the case, but it is a comforting thought

25  nonetheless.

1      Finally, your Honor, all I can say is that I

2    hope you are just and I hope you're confident in your

3    decision to put this man away for all the damage he has

4    done, the eight years of abuse, the pain and suffering

5    for what has now become years after and everything else

6    that we still can't begin to fathom.  Thank you for

7    your consideration.

8         THE COURT:  If you were here, I would thank you

9    for the courage and the ability to articulate so well

10   the effect that this has had on both the mom and the

11   daughter here.  So I want to thank you remotely for

12   that.

13        MR. McADAMS:  Thank you, your Honor.

14        THE COURT:  Mr. McAdams.

15        MR. McADAMS:  Thank you, your Honor.  I know

16   it's important that you said those words, and it's

17   important for them to hear that you're speaking to

18   them.

19        THE COURT:  John, you've got to speak right into

20   the --

21        MR. McADAMS:  Sorry, your Honor.  I know that

22   it's important.  I thank you for those words because I

23   know it's important to the victims that they know that

24   you hear them and that you see them in this process.

25        It's always difficult for me as a prosecutor to

1    get up and argue after presenting victim statements or

2    victim words because it's difficult to add anything to

3    what they're saying that's meaningful or matters.

4         And so part of what I'm doing is the more

5    technical side of it and arguing the 3553 factors, so

6    to speak, that the Court has to consider in fashioning

7    a sentence.

8         In any case, the Court is required to consider

9    the seriousness of the offense and the nature and

10   characteristics of the Defendant and fashion a sentence

11   that is sufficient but no greater than necessary to

12   accomplish those purposes, which include deterrence,

13   punishment, protection of the public, protection of any

14   victims in the case and other factors that the Court

15   articulates that are in that statute.

16        This is one of those cases where the seriousness

17   of the offense is so high on the scale of balance that

18   most of the other factors don't play much of a role,

19   from the Government's perspective.

20        This Defendant has been convicted of crimes

21   which carry mandatory minimum sentences of ten and five

22   years.  One of the charges carries a statutory maximum

23   authorized by Congress of life imprisonment.  And as we

24   see from going through the guideline calculations, the

25   Sentencing Commission has calculated a guideline range

1    that recommends a sentence of life imprisonment.

2         In the Government's view, a sentence of life

3    imprisonment is appropriate and is the only sentence

4    that can satisfy those statutory factors.

5         I don't want to get into factual details about

6    the Defendant's offense conduct.  That's been laid out

7    in great detail in the presentence report.  The Court

8    knows what happened, the Defendant knows what happened,

9    and I don't think it's necessary for me to repeat what

10   happened because I don't think that that's going to

11   help anything.

12        But at its essence, this is a man who abused the

13   most sacred trust a human being can be given,

14   responsibility for the health and well-being of another

15   living soul, his own child.

16        That's a rank higher than any rank that he could

17   achieve in the United States military.  It is a rank

18   that is the highest that any man can achieve, and he

19   abused it.  He dehumanized her.  He used her for his

20   own perverted sexual deviancy.

21        And abusing her himself wasn't even enough for

22   this man.  Before he was caught, days before he was

23   caught, he was offering her to another pervert that he

24   was chatting with on the internet.

25        And it wasn't just fantasy chat.  It wasn't just

1    fantasy talk.  Federal agents investigated those

2    claims, they identified the individual he was speaking

3    to who was in Rhode Island, they executed a search

4    warrant on that person's residence, and they confirmed

5    the nature of those conversations.

6         And the Defendant himself admitted that he had

7    told -- that he had offered and asked that person to

8    come to his home to help him abuse his daughter.

9         And the daughter in her own forensic interview

10   told agents, unknowing that we had this information,

11   that he had said this to her, that he had planned on

12   having someone come.  That was to occur literally days

13   after the search warrant was planned to be executed.

14   He had been having those conversations in real time.

15        That's why he thought the agents were there.  He

16   didn't even know that they were there because of the

17   child pornography that was on his computer.

18        So it's difficult to overstate the seriousness

19   of this offense, and what we do here today, your Honor,

20   what -- the sentence this Court imposes is society's

21   response to that conduct.

22        And I understand that the Court is required to

23   also balance it against the nature and characteristics

24   of the Defendant, and I've had many conversations with

25   the victim and her family about the role that that

1    factor plays in sentencing and the job that defense

2    attorneys have to do and that it would be part of this

3    proceeding that the positives of the Defendant's life

4    will be brought to the Court's attention.

5         And I have to say that repeatedly I was warned

6    during those conversations that they were worried that

7    this Defendant would manipulate that process, that they

8    were worried that he is so good at manipulation and

9    they were worried that the Court might be susceptible

10   to that.

11        I repeatedly explained that the Court has

12   sentenced many Defendants in many cases and is more

13   than capable of sorting through that information, but I

14   have to be honest with you, Judge.  When the

15   Defendant's sentencing memo got filed less than 48

16   hours before the sentencing and it included a

17   psychosexual evaluation that had not been disclosed to

18   me before, even though the PSR initially came out a

19   year ago, and it included a manuscript of a book that

20   the Defendant intends to publish or hopes to publish

21   which is essentially a self-help guide for other sex

22   offenders -- and, frankly, I read the book Wednesday

23   night.  It wasn't how I want to spend Wednesday night;

24   but I read the book, and it's well written.  It's what

25   you would expect from a naval officer who was on the

1    faculty at the Naval War College.

2         But it's also a manifesto of psychobabble that

3    hits every conceivable point that you could possibly

4    make with the precision of a drone strike, and I use

5    that analogy intentionally knowing that there's often

6    collateral damage from drone strikes.

7         There was even a chapter in his book on

8    self-forgiveness; and this is where I really got

9    concerned about manipulation because I've been in front

10   of this Court many times in many cases and I know that

11   the Court often, and I think appropriately, tells

12   Defendants that it's important for them to seek

13   self-forgiveness at some point in their sentencing.

14   And it started to concern me that perhaps this

15   Defendant had become aware of that himself.

16        But the hubris of this Defendant to have written

17   a book from the perspective of someone who has already

18   achieved self-forgiveness and is now providing that

19   help to other sexual offenders, and it's written from a

20   view of someone who's completed his sentence already,

21   the hubris was so high from my perspective that I went

22   back to Mr. Keating's, not Dr. Keating's, report to see

23   if he diagnosed him with narcissistic personality

24   disorder, and I didn't see it.  It wasn't there.

25        I think there are a lot of problems with that

1    report.  I'm not going to spend a lot of time on that.

2    But this book, your Honor, I think demonstrates the

3    concern that these victims have about manipulation.

4         He talks about how he's already -- he hit rock

5    bottom and he came back and now he's offering advice to

6    other sex offenders on how to recover from rock bottom.

7         As I said, I understand the need for

8    self-forgiveness in Defendants, but maybe not so fast,

9    maybe not before you've even been sentenced.

10        He has no right to claim that he has hit rock

11   bottom.  He took a millstone and tied it around his

12   daughter's neck and threw her off a cliff, and she is

13   still falling.  We know that from those victim impact

14   statements.  He doesn't get to hit rock bottom before

15   she does, and he should not be around or be free when

16   she's coming back up.

17        I don't want to spend a lot of time on the

18   psychosexual evaluation report because I don't think,

19   frankly, that it should matter.  I think you could take

20   everything that's in there and say, okay, that's all

21   true, and I think my response would be he still ought

22   to spend the rest of his life in prison.

23        But just on a brief bullet point, again, the

24   report is written by a social worker, not a

25   psychiatrist, not a psychologist.  He essentially

1    administered two tests, the MCMI-III and the Static-99.

2           We see these tests a lot, and Mr. Calcagni and I

3    had a trial in which it was the central factor of the

4    defense.  These tests have some value in psychiatry,

5    they have some value in social work, but they are not

6    accurate predictors of recidivism.  They are not --

7    they are self-reported tests.

8           The MCMI-III is 175 true or false questions the

9    Defendant answers.  There's no attempt to corroborate

10   the accuracy of those answers.  There's no interview

11   with the victim or the victim's family.  There's --

12   they take those questions, and they put them on a

13   scale.

14          The Static-99 is based on comparing sex

15   offenders to predict their recidivism rates.  And I've

16   been doing these kinds of cases now in this district

17   for 10 years, I've been a federal prosecutor for almost

18   20, and I see these evaluations all the time; and

19   surprise, surprise, I think with one exception they

20   always say they've got a one percent chance of

21   recidivism.

22          And I think the reason for that is because the

23   standard that the Static-99 uses is essentially

24   useless.  It compares the risk of this Defendant, who's

25   got a zero criminal history and hasn't been sentenced

1    yet, to sex offenders who have been convicted of a

2    crime and then subsequently get convicted of another

3    crime.

4         We know that sex offenses are the least reported

5    crimes that there are out there, that there are huge

6    numbers of sexual exploitation offenses that are never

7    reported to law enforcement and that even among those

8    that are reported to law enforcement that our rates of

9    successful investigation and prosecution are not great.

10   They're not very high.

11        So it doesn't tell you very much to compare the

12   recidivism rates of people who are twice convicted of a

13   sex offense.

14        At the end of the day, your Honor, I don't

15   really want to spend any more time talking about Ronald

16   Zenga because this case and the sentence that's imposed

17   really isn't about him.

18        This is about protecting this victim and society

19   from him; and the one thing this Court can do is

20   prevent him from ever, ever bothering them again.  The

21   Government recommends that it do so by imposing the

22   maximum sentence, the recommended sentence by the

23   guidelines, of life imprisonment.  Thank you, your

24   Honor.

25        THE COURT:  Thanks, Mr. McAdams.

1          Mr. Calcagni.

2          MR. CALCAGNI:  Your Honor, may I take a moment?

3          THE COURT:  Sure, of course.

4          (Pause)

5          MR. CALCAGNI:  Your Honor, advocating for a

6     Defendant facing a life sentence is the most humbling

7     experience.  I would suggest to the Court that, for

8     you, determining sentence in a case of this nature is

9     the greatest responsibility.

10         The Government opened its remarks by reminding

11    the Court of the quintessential 3553 language and how

12    your sentence today needs to be no greater than

13    necessary to achieve the sentencing factors.

14         I would suggest to the Court that the guideline

15    and Government's recommendation of a life sentence is

16    greater than necessary.  I suggest to the Court that

17    life sentences, and in the federal system life is life,

18    should be reserved for the most evil, the most

19    dangerous and the most violent criminals, those

20    individuals who cannot be saved under any circumstances

21    and those individuals for whom society must be forever

22    protected.

23         I would suggest to the Court that Ronald

24    Zenga's misconduct in this case cannot be overstated.

25    Mr. McAdams is absolutely right.  But Ronald Zenga does

1     not deserve to spend the rest of his life in prison.

2     He is not the type of individuals that this Court

3     should warehouse in the BOP for eternity.

4          We are here today because Ronald Zenga committed

5     egregious misconduct, but much of the misconduct that

6     is before the Court today is based upon Mr. Zenga's

7     self-reporting.  It was Mr. Zenga who brought the full

8     scope and breadth of his actions to the attention of

9     law enforcement long before ▆▆▆▆ and ▆▆▆▆ said a

10    thing.

11         THE COURT:  Hold on.  If you cannot use any

12    identifying names, Mr. Calcagni, I'd appreciate it.

13    I'm going to strike from the record the use of those

14    first names.  I should have told you that before.  It's

15    my fault.

16         MR. CALCAGNI:  I apologize.

17         THE COURT:  That's okay.  You don't need to.

18         MR. CALCAGNI:  But it was Mr. Zenga who brought

19    the full scope of his misconduct to the table, and I

20    think that is a critical factor for your consideration.

21    It's also a critical factor in weighing some of the

22    argument and commentary of Mr. McAdams.

23         How many Defendants have come before this Court

24    and minimized or marginalized their misconduct?  How

25    many Defendants get arrested and are in denial while in

1    custody of law enforcement or evade when they are in

2    the proffer sessions with the Government?

3         Not Mr. Zenga.  He got arrested, and he put it

4    all on the table, and that is a critical element in

5    this case when assessing his true rehabilitative

6    potential.  There is a lot more to Ronald Zenga than

7    the misconduct that is before you today.

8         When you look at the time he spent at the Wyatt,

9    the courses he's completed, the conduct he's engaged in

10   and the counselling he's sought and received, the

11   defense is astonished by the amount of work and effort

12   that this individual has put in to trying to repair

13   himself and the extensive damage that his actions have

14   caused; and that should give the Court a preview that

15   this individual has a lot more to offer the world and

16   need not be cut off in the manner that Mr. McAdams

17   requests.

18        The journal that was put before you that

19   Mr. McAdams commented on was something that was

20   important to Mr. Zenga for you to see.  I knew it was

21   long and lengthy, single-spaced, and I said to the

22   client, Maybe not such a good idea; and Mr. Zenga

23   emphasized for me and Mr. MacDonald how preparing that

24   journal was part and remains part of his

25   self-rehabilitative process.

1        Mr. Zenga is not an evil person, your Honor,

2   and the egregious conduct that he committed in this

3   case was not the product of some sinister or evil plan.

4        Mr. McAdams is right.  Abusing children is the

5   most egregious misconduct known to the law, but I would

6   suggest to you that this type of conduct is much

7   different than violent acts of robbery or murder, much

8   different than selling drugs or things motivated by

9   greed.

10       Abusing children is rooted in mental illness.

11  You see, the rest of us in this courtroom, we don't

12  have any sexual proclivities towards children because

13  we have no attraction to them.  Our brains are not hard

14  wired in that fashion.

15       And the majority of society hears about people

16  viewing child pornography or sexually abusing children

17  and are repelled by even the stories of it.  It's

18  because of the way we are wired.

19       People like Mr. Zenga require treatment.  That

20  was the purpose of the Leo Keating report, to suggest

21  to the Court that this Defendant has mental illness,

22  this Defendant has received and will benefit from

23  future treatment and that this Defendant can be and

24  should be salvaged.

25       Whatever the Court decides to impose for a

1    sentence today is undoubtedly going to be measured by

2    decades, whether the Court imposes a sentence of 10,

3    15, 20 years, whether the Court considers the

4    Government's lifelong recommendation.

5         Mr. Zenga has the makings of being able to be

6    rehabilitated; and he has the ability with the proper

7    treatment, supervision and time to be restored to a

8    place where he can safely be returned to the community.

9         And, for that, we ask the Court today to deny

10   the Government's sentencing recommendation and to

11   impose a sentence of less than his natural life.

12        THE COURT:  Thank you, Mr. Calcagni.

13        MR. CALCAGNI:  Thank you.

14        THE COURT:  Mr. Zenga, do you wish to address

15   the Court before I impose sentence?

16        THE DEFENDANT:  Yes, your Honor, I do.

17        THE COURT:  Why don't you remain seated, if you

18   don't mind.  It's just easier for us to hear.  And if

19   you'd pull the microphone right in and speak directly

20   into it, I'd appreciate it.

21        THE DEFENDANT:  Yes, your Honor.  Is this close

22   enough?

23        THE COURT:  Yes.  Perfect.  Thank you.

24        THE DEFENDANT:  Thank you, sir.  Your Honor, I

25   am grateful for this opportunity to address the Court.

1    It has been nearly three years since I was arrested;

2    and, your Honor, it's been almost a full year since I

3    appeared before you to plead guilty to these offenses.

4         I am here before you today knowing full well

5    that today will be the only chance I have to address

6    not only you but, most importantly, everyone I have

7    harmed by my actions.  Today is for them.  Today's

8    about justice for them.

9         To begin, first and foremost, I must apologize

10   to my daughter.  I am sorry for everything I put you

11   through.  When you needed a father, someone to trust, I

12   absolutely betrayed your trust, and instead I gave you

13   a man who thought only of himself.

14        My actions have caused you emotions that I can't

15   even begin to understand.  Above hurt and confusion and

16   anxiety and everything else, I know I have cast a

17   shadow against memories that used to be -- that used to

18   be happy, that used to be special; and I, myself, even

19   look back wondering if those things even happened.  We

20   went flying together.  Even little family events that

21   are now destroyed by what I have put you through.

22        Hearing such a brave person here today only

23   reinforces the delusional, immoral and selfish nature

24   of what I did.  I need you to know that none of this is

25   your fault and it never could have been.  I was the

1   adult.

2          Every time something happened to you, every

3   single time something happened to you, I was the one

4   who had the ability to stop it, but I didn't.  I could

5   have, and I didn't.  Absolutely everything that has

6   happened to you is my fault, and I'm sorry for not

7   being the father that you needed in absolutely every

8   single one of those moments.

9          Everyone who knows you would want to be the

10  person to be able to be there for through the good

11  times and support you through the bad times and proudly

12  call themselves your friend or even your father, and I

13  threw all of that away because of my choices.

14         I am proud of you today for what you have done

15  and the words that you have said, but I am not

16  surprised.  You have always been a strong person who

17  knows the difference between right and wrong, and you

18  more than anyone else deserve to have your voice heard.

19  You deserve to be able to stand up and demand your

20  justice.

21         The words in your statements, not just today,

22  but everything you've said since my arrest, has bravely

23  demonstrated the depth and the amount of the pain and

24  suffering that I have caused you.

25         I thank you for your honesty.  I thank you for

not holding back anything.  And if I could, I would give you the chance to just take the days and the weeks and the months to go through everything, just scream it out, whatever you need to do to process, to understand, to inflict upon me what has happened in your past and be able to move past that.  I owe that to you.  You deserve that closure.

Your words today make it crystal clear that my memory and my presence in your life is no longer desired, and I have not reached out in the last three years and I will not do so in the future regardless of where I may be after today.

But I want you to know that I love you and I will not stop working to repair the damage I have done to you, the damage that I've done to everyone in my life, to all of our families.

The words "I'm sorry," the words "I apologize," any words I say I know are going to fall short of what you are due.  I owe you so much more than words.  I pray that my actions since my arrest and my actions today and my actions going forward will show you the depth of my remorse and strengthen my commitment to atoning for absolutely everything that I have done to you.

I love you, and I am sorry.  I apologize to you

1   for absolutely everything I did, everything I put you
2   through, everything I did, everything I should have
3   done.
4           I want you to know that I accept fully the
5   responsibility and will be held accountable for
6   absolutely everything I did, and I will accept your
7   consequences here today.
8           I must also apologize to the children in the
9   pictures I viewed.  I am sorry.  I viewed images of you
10  on the worst days of your lives; and instead of, like
11  my daughter, seeing them as children having their
12  innocence ripped from them, I saw objects of fantasy
13  and lust.
14          I dehumanized all of them.  I viewed them as
15  objects and not people entitled to compassion or
16  respect.  I used the images of your abuse to sexually
17  gratify myself; and, worst of all, I know that the
18  notification of my offense has caused you to be pulled
19  back into those moments and to be revictimized.  It's
20  the same way that my memories of this day and memories
21  of everything will resonate with my daughter.
22          Viewing child pornography, writing obscene
23  stories, is immoral, is unconscionable, and it was
24  completely ignorant of your dignity as human beings.
25  The feelings that I feel, the guilt and the shame and

1    the remorse, is absolutely nothing compared to what you

2    feel; and I know it's nothing compared to what my

3    daughter feels every day.

4         I pray the day comes when all of you no longer

5    have to experience your trauma.  I'm offering to you

6    the same promise.  I pray that -- I offer you the same

7    promise I made to my daughter.  You will not have to

8    worry about me now or in the future, and I will

9    dedicate myself to preventing others from doing the

10   same things I have done, and I will not stop working to

11   atone for my offenses.

12        I alone am to blame for the pain I have caused

13   all of you.  I apologize to you for everything I have

14   done.  As I said to my daughter, I accept full

15   responsibility for my actions.  I accept all of the

16   consequences no matter what they may be.

17        To my family, to my ex-wife and to her family

18   and the families of all the children whose pictures I

19   viewed, I am sorry.  I'm sorry for putting you through

20   the type of pain that mothers and fathers and sisters

21   and brothers and nieces and nephews and aunts and

22   uncles should never, ever have to go through.

23        My actions have caused all of you to experience

24   the worst emotions imaginable and question yourselves,

25   question your values, to question everything.

1    Everything you feel that I can't describe and I can't

2    understand, powerlessness, anxiety, all those feelings

3    will be honored here today.  You're entitled to every

4    bit of rage you feel against me.

5         And I know I cannot speak for the thousands of

6    men and women who have also viewed the pictures of your

7    loved ones.  I can speak for myself today and say that

8    I am the person that the families of the children whose

9    pictures were viewed and those children, I'm the person

10   you do not need to fear.  I am not the person whose own

11   family needs to worry about my future actions being a

12   repeat of my past actions.

13        I am not the father who ignored the harm I have

14   done to my daughter or shirk my duties of providing any

15   type of financial support, providing her a college

16   education and supporting her in any way the law allows

17   me to.

18        Just as all of our children know, any words I

19   say today fall short of making things right.  Only

20   actions that are sustained, are virtues, that are

21   caring, that are compassionate, that are understanding,

22   that all the things I didn't give, that only those

23   things can even start to give you something like

24   normalcy or security.

25        I promise you I will live by those values.  I

1    alone am to blame for everything that you feel, I've

2    caused you and your family members, and I apologize to

3    you for what I have done.  I accept the full measure of

4    responsibility for my actions and all of the

5    consequences.

6        Your Honor, I know Attorney McAdams has done a

7    very articulate job of pointing out just how absolutely

8    horrible my actions were; and as strong as his language

9    was, it pales in comparison to the way I've described

10    myself for the last three years.

11        Regardless of who describes what I did, I can

12    tell you I alone am to blame for those actions.  I know

13    that instead of seeking help for my problems, I chose

14    to man up.  I chose to handle everything myself.  I

15    chose to bottle up my emotions so I wouldn't appear

16    weak.

17        I was scared to death of being the guy, of being

18    the vet who's hearing things that aren't there, who

19    has -- the guy who has dreams, they're so vivid that he

20    wakes up and can't tell if he actually lived them.

21        I chose to ignore all of that.  I chose to

22    ignore the fact that this wasn't making me better, and

23    I doubled down.  I doubled down on my decisions.

24    Instead of getting help, I chose to distract myself and

25    I chose to medicate myself.  I chose to lose myself in

sex.

I had the choice to drink.  I had the choice to do cocaine.  I had the choice to do anything.  I had the choice to stop.  I didn't make any of those choices because in those moments every -- everything was wiped away.  Everything was wiped away.

I was online.  I was writing stories about men and women abusing their children.  I was masturbating to child pornography, and it wiped everything away. Afterwards, the guilt and the shame and the remorse I felt, it made me feel like a monster.

I could make that go away again by doing the same damn thing, and every time I felt worse afterwards and I wanted to do it more so it would go away.

I'd swear every time -- I'd swear every time was the last time, and it was never that way.  I came to believe, I came to know that this was the way to feel better, this was the way to get through, this was the way to survive, this was the way to make it all go away.

And soon that wasn't enough, and I needed more, and I needed stronger; and it got to the point before my arrest, I needed some sort of -- I needed some sort of stimulus just on a daily basis just to feel normal. Whether it was deviant, whether it was someone else's

1    stories, I needed something to move through the day.

2         It is so just -- it's grotesquely absurd when

3    you think about, again, what's been said.  I had the

4    courage to fly an armed helicopter in combat.  I had

5    the courage to remarry my wife when everyone told me

6    not to.  None of that matters.

7         I didn't have the courage to say I was hearing

8    things and seeing things.  I didn't have the courage to

9    tell anyone I was addicted to child pornography, and I

10   didn't have the courage to tell anyone that I was

11   molesting my daughter, let alone stop it on my own.

12        In that way I am very grateful to Homeland

13   Security for stopping me.  I am very grateful.  Whether

14   it's me or anyone else that tries to call this an

15   explanation or how I got to where I am, none of it,

16   none of it can ever minimize, none of it can ever

17   rationalize what I did, and none of it can ever deflect

18   any of the responsibility for what I did.

19        Your Honor, I want to tell you today that I know

20   there was a part of me that did this stuff.  There was

21   a son who, if they're watching, I couldn't tell my

22   parents.  Who wants a son like that?  I couldn't tell

23   my brother, if he's watching.  All the times you tried

24   to reconnect with me and bring me home, I couldn't do

25   that because I was isolating myself because I didn't

1   want to be around myself.

2          I was a husband with a best friend who supported

3   me, and I knew everything she had been through.  I knew

4   everything she suffered through her life.  I couldn't

5   tell her.

6          In my head, maybe I thought no one's love for me

7   was unconditional.  My wife and I have been through so

8   many of the same experiences in our lives, and we have

9   lived that cycle of trauma and abuse.

10         I remember being at -- I'm sorry.  I remember

11   being at the Boston Science Museum with her once, and

12   there's this -- and there was an exhibit on the brain.

13   They had research on the walls.  And we were standing

14   there, and we talked to someone from UMass or

15   something.  And they had research up that talked about

16   vets, PTSD and pleasure seeking and addictive behavior.

17         I remember breaking down in the middle of the

18   museum and crying and waving it off because I have bad

19   memories.  No, it wasn't because I had bad memories,

20   your Honor.  It was because in that research I was the

21   one -- I was the one looking at child pornography and I

22   was the one molesting my daughter.

23         Had I told her then, it wouldn't have changed

24   any of -- it wouldn't have changed any of her

25   experiences with our daughter, but it would have saved

1   my daughter, would have saved her abuse.  And in that

2   moment, I didn't have the courage to do it.

3       And above all these, I'm a father.  I am a

4   father who molested his daughter while pursuing the

5   realization of some sort of sick fantasy.  That's where

6   I was.  That's who I was.

7       Every day I think of all of those people.  I've

8   been trying to stick a knife in them, your Honor, and

9   I've been trying to twist it.  It took me time to

10  create those people, and it's going to take me time to

11  destroy them as well, and I ask you for the chance to

12  do that.

13      I want you to know that since my incarceration's

14  begun, I have refused to take my place in front of that

15  TV in the day room and just let my time go by.  I have

16  been reading; and as Attorney McAdams and Attorney

17  Calcagni have pointed out, I've been trying to change

18  myself.

19      All we have there is books and each other, and

20  we have some help.  I've read *Care of the Soul*.  I've

21  read *Man's Search For Meaning.*  I've read *Common Sense*

22  *Recovery.*  I've read books by sexual health experts.

23  I've read hundreds of books on those and other

24  subjects.

25      For the first time in my life, and this is why I

have to go back to thanking Homeland Security, for the first time in my life, I have had the ability to see myself as myself, to see my actions for what they have been.  For the first time in my life, I've begun taking medication to treat my PTSD and my depression.  I have reached out to national sex offender treatment centers looking for help.

And yes, I have found my God again.  I have been the cofacilitator of the sex offender treatment program at Wyatt since February of 2020.  Working with the men that I have seen over those years in group has opened my eyes.

In that time I've seen people who have appeared before you, sir.  I've seen people who long to change. I've seen people who don't give a damn, and I have seen men who are waiting to reoffend and to gratify themselves again.  And this has opened my eyes to how I have come to be here in front of you today, sir.

I remember the first time I tried to tell someone that I molested my daughter.  Unfortunately, the person I chose to speak to was Jay Gaccione.  I don't know.  It was after a group session where he had partially mentioned some of the things that he had did, and I tried to open up to him; and, instead, I was met with a revelry and a longing recollection of what he

1    had done.  And after that day, I did not tell anyone

2    what I had done to my daughter for over a year.

3        I am very proud, yes, of the time that I have

4    spent working.  I am proud of what I've read.  I'm

5    proud of what I have written, and I know that this has

6    opened my eyes to what I can do instead of causing the

7    pain and the trauma that I have already done.

8        I know I can help stop cycle -- stop the cycle

9    of abuse that I was part of, I was a part of as a

10   child, I was part of as a young adult, and it was

11   something that I perpetuated as a father.

12       We inflict these lifelong effects on our

13   children, and then they end up passing it on to the

14   next generation and the next generation and the next

15   generation, and it doesn't stop, and then it's a

16   sickness.

17       And I used to avoid my thoughts of it because I

18   was weak and I was scared to deal with them, but I

19   think now I deal with them because I'm scared of what I

20   did when I avoided them.

21       Sir, after today is done, I know there will be

22   some people that forget about me; but I know I will

23   remember what I've done, and I know every single

24   survivor of my abuse will remember what I have done.

25       I am the one who wrote those stories, who viewed

1    those pictures and who molested his daughter.  I will

2    remember that.  And I know they will remember a

3    selfish, immoral, deviant man who wrote those fantasies

4    because he treated them as less than human, who treated

5    them as objects, is what I did.

6          I know I will remember what I've done to my

7    family, to their families, to their friends, to my wife

8    and to her family.  I know they will remember every

9    inch of what I have put them through, emotions I can't

10   describe, the shock, the guilt, the anger.

11         I know I will remember that I have hurt, abused

12   and lost the most kind, sincere, talented and unique

13   daughter in the world because I subjected her to the

14   very -- I subjected her to everything I should have

15   protected her from.

16         My daughter is going to remember everything I

17   did, and she's going to have the rest of her life to

18   wonder how her life could have been better.

19         THE COURT:  Mr. Zenga, you're going to have to

20   wrap it up, sir.

21         THE DEFENDANT:  I'm sorry.  If she were to have

22   a better father.  In closing, it's my greatest hope

23   that my daughter and the other victims receive the help

24   and counselling that I never received; that my wife, my

25   brother, my mother and I never received; and I pray

1    that no one involved with this will continue the cycle

2    of abuse or suffer the lifelong consequences that have

3    been on both sides of my family for generations.

4         And I hope everyone involved realizes that they

5    don't want to be -- they don't want to be me, they

6    don't want to fill the holes in their lives with lies.

7         I apologize to everyone, everyone who was

8    involved, for everything I did, for everything I failed

9    to do.  You are all wonderful people I think who

10   deserve love and kindness and respect and courtesy.  I

11   didn't give you those things.

12        And I pray that your sentence, your Honor, is

13   able to provide them some sort of closure.

14             THE COURT:  Thank you, Mr. Zenga.

15             THE DEFENDANT:  Thank you, your Honor.

16             THE COURT:  Mr. Zenga, the law tells us what the

17   Court must do to put together a just sentence.  The law

18   tells us that we begin with the guideline range, which

19   we do and we must and we have, in calculating them

20   correctly here.

21        The law then tells us that the Court needs to

22   fashion a sentence that is multifaceted, one that

23   punishes you for the crime that's appropriate, one that

24   deters you from committing the crime again, one that

25   sends a message to the public that deters the public or

1    others from committing a like or similar crime, one

2    that helps show respect for the law and one that

3    involves concern with the rehabilitation of the

4    Defendant that stands before us.

5         We consider the severity of the crime.  We

6    consider the history and characteristics of the person.

7    And then ultimately, as your fine attorney said, the

8    ultimate question for the Court in sentencing someone

9    is what is sufficient but not more than necessary in

10   order to accomplish all of these goals.

11        I will say from the outset every one of these

12   factors I can say with great confidence after much

13   study and contemplation, every one of these factors

14   leads me to conclude that the appropriate sentence in

15   this case is life.

16        I have considered that severely, I've considered

17   it intensely, and I can confidently say that every one

18   of these factors points towards a sentence of life.

19   And I can say that with greater confidence because, you

20   may not realize this, but you have two of the finest

21   defense lawyers in this state; and when even their

22   outstanding advocacy couldn't lead me to any other

23   conclusion, I can confidently say that a life sentence

24   is appropriate.

25        The strongest aspect of this, Mr. Zenga, is

1   punishment.  When one considers what appropriate

2   punishment is, a lot of the focus is on the victim,

3   what's appropriate punishment for the effect of the

4   crime that's been committed.

5        Here, the young woman that endured the eight or

6   nine years of abuse, physical, psychological and every

7   other way, was so incredibly articulate, smart,

8   together, human, more so than I've ever seen from a

9   victim, and I've now sentenced scores of folks involved

10  in childhood sexual abuse.  She is an accomplished,

11  smart woman.  I don't know how she has gotten into such

12  a fashion after the abuse that she endured for these

13  eight or nine years.

14       She was -- she laid out in her first letter to

15  me the incredible harm that this has caused her and how

16  it affects every aspect of her life and will forever,

17  despite what I'm sure will be accomplishments in her

18  life and positive progress.

19       So the crime that you committed requires the

20  utmost punishment.  I can't think of another crime

21  that's come before me that calls -- that doesn't call

22  for the severe -- let me try that again.  The severity

23  of the crime that you've committed calls for the most

24  severe punishment that the Court can put forth.

25       The second reason is to deter you.  I have

1   studied the issue of sexual abuse that's come before

2   us.  I've studied the medical literature, and I've

3   studied the scientific literature; and I'm sad to say

4   that it is so inconclusive as to a person's ability to

5   rehabilitate after the crime, the length of crime, the

6   degree of crime, the depth of crime that you've

7   committed, whether there's any ability to change that

8   behavior, and the answer is inconclusive.  That's the

9   best I can get out of it all.

10       I read and considered the social worker's

11  statement that came before me.  He may be right.  He

12  may not be right.  I don't know.  But from my

13  perspective, anything short of life will not give me

14  confidence that you will be deterred from doing this

15  again.

16       Deterring the public, I don't think people are

17  influenced that commit this crime by a sentence that I

18  give; but the message has to go in connection with

19  respect for the law to the public that if you abuse

20  your child or any child and you do it for eight years

21  and you do it in a thoughtful, manipulative, consistent

22  and, yes, evil way, then the message has to go out that

23  you lose your right to liberty.  Period.

24       And whether you can be rehabilitated or not, I

25  don't know.  I considered all of the fine work that

1    you've done at Wyatt since you've been there.  I

2    appreciated your attorneys sending all that material to

3    me.  And I hope that you get rehabilitated, and I hope

4    you figure out a way to lead a positive life; but it

5    just won't be with the liberties that the rest of us

6    are able to enjoy.

7         So considering the guidelines, considering the

8    3553 factors, the Court can confidently say and does

9    impose, as to Count I, a period of life sentence.  As

10   to Counts VI and VII, the Court imposes the statutory

11   maximum of 20 years.  As to Count VIII, the Court

12   imposes the statutory maximum of 10 years, all to be

13   run concurrently such that the sentence collectively

14   imposed is life.

15        The Court will, in addition, impose a period of

16   lifetime of supervised release just with the standard

17   conditions.

18        The Court has received a request for restitution

19   from the victims in this matter.  This Court has

20   reviewed the evidence that's been presented by the

21   victim, and the Court can say and finds that

22   restitution is appropriate in the amount of $500,000,

23   and the Court imposes that as restitution in this case.

24        The Court also imposes the mandatory $400

25   special assessment as well as the $20,000 JVTA, which

1    is $5,000 per count, special assessment.

2              Mr. Zenga, as part of your plea agreement, you

3    agreed to waive any right to appeal the sentence that I

4    impose if the Court imposed a sentence that was within

5    the guideline range.  This is a guideline range

6    sentence; and, therefore, you've waived any right to

7    appeal the sentence that I impose under those

8    circumstances.  Do you understand that?

9              THE DEFENDANT:  Yes, your Honor, I do.

10             THE COURT:  Okay.  Where is Ms. Picozzi?

11   Anything further for probation?

12             THE PROBATION OFFICER:  No, your Honor.

13             THE COURT:  Mr. McAdams, anything further for

14   the Government?

15             MR. McADAMS:  Your Honor, pursuant to the plea

16   agreement, the Government moves to dismiss Counts II

17   through V of the Indictment.

18             THE COURT:  Any objection, Mr. Calcagni?

19             MR. CALCAGNI:  No, your Honor.

20             THE COURT:  Great.  Those counts will be

21   dismissed.

22             Mr. Calcagni, anything further for Mr. Zenga?

23             MR. CALCAGNI:  No, your Honor.

24             THE COURT:  Great.  Thank you.  I want to thank

25   counsel for your fine advocacy.  The system would not

1    work if it weren't for excellent attorneys for both

2    sides here.  I want to thank you for that.

3         They're not easy.  They are difficult.  I often

4    say the hardest job in this Court at times like this is

5    defense counsel.  So I want to particularly acknowledge

6    the fine work that was done there.

7         If the young woman and her mom are still

8    listening, I want -- it sounds trite to say this, but I

9    hope the young woman understands that the Court

10   believes, knows as a matter of fact, that none of this

11   was your fault.

12        Unfortunately, you're going to have to live with

13   it the rest of your life.  I hope you find it in a way

14   to garner all of the positives that are in you that

15   I've identified and others have identified and use that

16   to continue a life of value and positivity and

17   productiveness.  I wish you the best.

18        With that, we'll stand adjourned.

19        (Adjourned)

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3

4          I, Karen M. Wischnowsky, RPR-RMR-CRR, do

5     hereby certify that the foregoing pages are a true and

6     accurate transcription of my stenographic notes in the

7     above-entitled case.

8

9          January 17, 2023

10     Date

11

12

13     /s/ Karen M. Wischnowsky_____

14     Karen M. Wischnowsky, RPR-RMR-CRR
       Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25